1

LATHAM & WATKINS LLP
  Kenneth M. Fitzgerald (Bar. No. 142505)
  Robert S. Huie (Bar No. 237374)

2

600 West Broadway, Suite 1800

3

San Diego, California 92101-3375.
Telephone: 1.619.236.1234

4

Facsimile: 1.619.696.7419

5

Attorneys for Plaintiff
ViaSat, Inc.

6

7

8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

11

VIASAT, INC., a Delaware Corporation,

CASE NO. '07 CV 2206 LAB (AJB)

12

Plaintiff,

COMPLAINT FOR BREACH OF
CONTRACT AND DECLARATORY
RELIEF

13

v.

14

*Incorporated in Missouri*

SIRICOMM, ~~INC., a Delware Corporation,~~
and DOES 1 through 10, inclusive,

JURY TRIAL DEMANDED

15

16

Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

1    Plaintiff ViaSat, Inc. ("ViaSat"), alleges as follows:

2    **INTRODUCTION**

3    1.    ViaSat is incorporated in Delaware with its principal place of business in

4    Carlsbad, California. ViaSat provides satellite and other wireless communications services to

5    businesses. ViaSat is authorized to conduct business in the State of California.

6    2.    Defendant SiriCOMM, Inc. ("SiriCOMM"), is incorporated in Delaware with its

7    principal place of business in Joplin, Missouri. SiriCOMM provides wireless networking

8    services to the trucking industry, including maintaining "hot spots" at truck stops and travel

9    centers throughout the country, where truckers can obtain wireless internet access.

10    3.    ViaSat does not know the true names or capacities of the defendants sued herein

11    under the fictitious names Doe One through Ten inclusive. ViaSat will amend this Complaint to

12    include their true names and capacities when they have been ascertained.

13    4.    ViaSat is informed and believes, and on that basis alleges, that Does 1 through 10,

14    inclusive, are individuals and entities that have engaged in the wrongful conduct set forth in this

15    Complaint.

16    5.    ViaSat is informed and believes, and on that basis alleges, that in doing the acts

17    alleged herein, all defendants were acting as the agents, servants, representatives and/or

18    employees of each other, and that defendants were acting within the scope of their authority as

19    such agents, servants, and/or employees with the permission, knowledge, consent and ratification

20    of their principals.

21    **JURISDICTION AND VENUE**

22    6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, in that

23    complete diversity of citizenship exists between the parties, and the amount in controversy

24    exceeds $75,000, exclusive of costs and interest.

25    7.    On information and belief, this Court has personal jurisdiction over SiriComm

26    because: (1) SiriCOMM transacts and has transacted business within the State of California,

27    thereby purposely availing itself of the privilege of conducting activities within this State; (2)

28    SiriCOMM provides services in the State of California, including maintaining numerous "hot

1  spots" in California; (3) SiriCOMM derives revenues from customers in the State of California;

2  and (4) the instant dispute arises out of SiriCOMM's failure to perform its contractual

3  obligations by making payment in the State of California to ViaSat, a party whose principal place

4  of business is in this State.

5       8.     Venue in this district is proper pursuant to 28 U.S.C. § 1391, in that a substantial

6  part of SiriCOMM's omissions giving rise to ViaSat's claims occurred in this judicial district.

7  SiriCOMM was required, and failed, to make payment to ViaSat within this judicial district.

8                           **GENERAL ALLEGATIONS**

9       **ViaSat and SiriCOMM Enter into a Service Agreement**

10       9.     On or about June 14, 2004, ViaSat and SiriCOMM entered into a Service

11  Agreement, a true and correct copy of which is attached to this Complaint as Exhibit A (the

12  "Service Agreement").

13       10.     Under the Service Agreement, the parties agreed that ViaSat would provide

14  SiriCOMM with services associated with the operation of SiriCOMM's wireless network, in

15  exchange for payment.  The nature of the services, and the pricing therefor, were set forth in the

16  first exhibit to the Service Agreement.

17       11.     Section 3 of the Service Agreement provided that the term of the agreement was

18  sixty months, unless terminated sooner in accordance with the agreement.

19       12.     Under Section 4 of the Service Agreement, SiriCOMM was required to make

20  payment to ViaSat net 30 days.  The Service Agreement provided that payment by check must be

21  sent to ViaSat's post office box in Los Angeles, and that payment by wire must be sent to

22  ViaSat's bank in San Diego.

23       13.     The Service Agreement expressly provided that, in the event of late payment by

24  SiriCOMM, ViaSat was entitled to suspend provision of services until the required payment was

25  received:

26           4.6.  ViaSat reserves the right to suspend provision of any or all
         Services until payment in accordance with this Agreement,

27           including payment for Services and all interest owed, is received
         by ViaSat.

28

LATHAM&WATKINS<sup>LLP</sup>  SD\610682.1
ATTORNEYS AT LAW
SAN DIEGO

COMPLAINT

14.    Section 12 of the Service Agreement provided the parties certain rights to terminate the agreement:

12.1. ViaSat may terminate this Agreement in the event that Customer breaches a material obligation of this Agreement and such breach continues for a period of sixty (60) days after ViaSat provides Customer a written notice thereof, setting forth the nature of the alleged breach.  Customer and ViaSat agree to a good faith effort to remedy such breach during this sixty (60) day period.

. . . .

12.3. Should the Agreement be terminated, pursuant to this section, for breach of a material obligation of the Customer, Customer shall be obligated to immediately pay to ViaSat all fees normally charged for the Services for the remaining balance of the Term of this Agreement.  Also any additional payments due by the Customer to ViaSat will be paid by the Customer in accordance with Section 4.3. . . .

12.4. Termination will entitle ViaSat to cancel any or all undelivered orders for Service activation or Technical Support Services without liability or obligation.

15.    The Service Agreement provided, at Section 15, that it would be interpreted in accordance with California law.

16.    Section 16.2 of the Service Agreement contained a non-waiver provision:

The waiver or failure of any Party hereto to exercise any right provided for in this Agreement shall not be deemed a waiver of any further right hereunder under such provision or any other provisions. . . .

**SiriCOMM Fails to Make Payment Under the Service Agreement**

17.    As of early April 2007, SiriCOMM had failed to make required payment under the Service Agreement.

18.    On or about April 6, 2007, ViaSat sent a letter to SiriCOMM giving formal notification of SiriCOMM's breach based on nonpayment, and giving SiriCOMM 60 days to cure its breach.  A true and correct copy of the letter is attached hereto as Exhibit B.

19.    As of early June, 2007, SiriCOMM still had failed to make required payment under the Service Agreement.

20.     On or about June 5, 2007, ViaSat sent another letter to SiriCOMM, explaining that SiriCOMM remained in material breach based on nonpayment, but that ViaSat was affording SiriCOMM additional time to make payment, in the interests of cooperation:

> Although ViaSat has decided not to terminate the Agreement as of June 6, 2007, SiriCOMM remains in material breach of the Agreement and therefore ViaSat reserves the right at any time to immediately terminate the Agreement upon further written notice. Any delay in providing further written notice to terminate the Agreement shall not constitute a waiver of any of ViaSat's rights or SiriCOMM's obligations under the Agreement.

A true and correct copy of ViaSat's June 5, 2007 letter is attached hereto as Exhibit C.

**SiriCOMM Executes a Promissory Note in Favor of ViaSat**

21.     On or about June 22, 2007, ViaSat and SiriCOMM agreed that certain amounts that SiriCOMM then owed ViaSat pursuant to the Service Agreement would be embodied and memorialized in a Promissory Note, with a principal amount of $1,144,246.48, bearing interest at a rate of 9.5% per annum. SiriCOMM's President and CEO executed a promissory note reflecting these and other terms (the "Promissory Note"). A true and correct copy of the Promissory Note is attached hereto as Exhibit D.

22.     The Promissory Note provided, at Section 1, that the principal and interest on the note would be due and payable by SiriCOMM in accordance with Schedule 1 attached thereto, with the first payment being due on July 15, 2007, and subsequent payments being due on the 15th day of each month. Paragraph 1 provided further that, "in the event that an Event of Default (as defined in Section 8 below) occurs, all outstanding principal and accrued interest shall become immediately due and payable in accordance with Section 9 . . . ."

23.     Section 8 of the Promissory Note provided that an Event of Default occurs where SiriCOMM "fails to pay timely any of the principal, interest or other amounts due under this Note on the date the same became due and payable (whether at the stated maturity, by acceleration, or otherwise)."

24.     Section 9 of the Promissory Note provided that upon the occurrence of an Event of Default, "all unpaid principal, accrued interest and other amounts owing hereunder shall be immediately due, payable and collectible by [ViaSat] pursuant to applicable law."

25.     The Promissory Note stated in Section 4 that all amounts payable shall be paid to ViaSat's office in Carlsbad, California.  Section 12 stated that the Promissory Note shall be governed by, and construed and enforced in accordance with, California law.

**SiriCOMM Continues to Fail to Make Required Payment**

26.     Even after executing the Promissory Note, SiriCOMM failed to make payment to ViaSat that came due and payable under the Service Agreement.  To date, SiriCOMM has failed to make required payment under the Service Agreement – even apart from the amount reflected in the Promissory Note – in the amount of $590,640.00 or more.

27.     SiriCOMM additionally failed to make payment to ViaSat that was due under the Promissory Note.  SiriCOMM failed to make the $9,058.62 payment to ViaSat that was due on November 15, 2007.  Accordingly, the entire amount of principal and interest on the Promissory Note is now due and payable.

28.     On Friday, November 16, 2007, ViaSat sent a letter to SiriCOMM terminating the Service Agreement.  ViaSat's letter stated:

> Although ViaSat has given SiriCOMM ample time to cure its material breaches of the Agreement, SiriCOMM has failed to cure such breaches and continues to be delinquent in amounts due and owing to ViaSat.  Accordingly, please take notice that ViaSat is hereby terminating the agreement effective immediately.

A true and correct copy of the foregoing letter is attached hereto as Exhibit E.

29.     Pursuant to Section 12.3 of the Service Agreement, SiriCOMM became obligated upon termination "to immediately pay to ViaSat all fees normally charged for the Services for the remaining balance of the Term of this Agreement."  This amount equals or exceeds $2,879,370.00.

30.     The following day, Saturday, November 17, 2007, ViaSat received an email message from SiriCOMM's President and CEO, copied to SiriCOMM's Board of Directors. This email stated, among other things, SiriCOMM's position that an immediate termination of service by ViaSat would constitute a breach of the Service Agreement, because SiriCOMM had not been given 60 days to cure its failure to pay ViaSat.

31.    SiriCOMM's email thereby ignored the following: (1) SiriCOMM had already been given a 60-day opportunity to cure its nonpayment, which it failed to avail itself of; (2) SiriCOMM's execution of the Promissory Note did not waive any of ViaSat's rights under the Service Agreement; (3) even after executing the Promissory Note, SiriCOMM failed to make additional payment required under the Service Agreement; (4) SiriCOMM failed to make a required payment under the Promissory Note, rendering all principal and interest under that note immediately due and payable; and (5) the Service Agreement clearly and expressly provided that "ViaSat reserves the right to suspend provision of any or all Services until payment in accordance with this Agreement, including payment for Services and all interest owed, is received by ViaSat."

## FIRST CLAIM FOR RELIEF

### (Breach of Service Agreement Against SiriCOMM)

32.    ViaSat realleges and incorporates by reference as though fully set forth herein each and every allegation of paragraphs 1 through 31.

33.    On or about June 14, 2004, ViaSat and SiriCOMM entered into the Service Agreement.  The Service Agreement is a valid and binding contract, supported by consideration, and entered into between parties with capacity.

34.    By executing the Service Agreement, SiriCOMM agreed, among other things, to make payments to ViaSat as provided in the agreement.

35.    ViaSat fully performed its obligations under the Service Agreement, and all conditions required for SiriCOMM's performance have occurred.

36.    As set forth herein, SiriCOMM breached the Service Agreement by failing to make required payment.

37.    As a direct and proximate result of SiriCOMM's breach, ViaSat has been damaged in an amount in excess of the jurisdictional minimum of this Court, and is entitled to recover all amounts due ViaSat under the terms of the Service Agreement.

**SECOND CLAIM FOR RELIEF**

**(Breach of Promissory Note Against SiriCOMM)**

38.    ViaSat realleges and incorporates by reference as though fully set forth herein each and every allegation of paragraphs 1 through 37.

39.    On or about June 22, 2007, SiriCOMM executed the Promissory Note in favor of ViaSat.  The Promissory Note is a valid and binding contract, supported by consideration, and entered into between parties with capacity.

40.    By executing the Service Agreement, SiriCOMM agreed, among other things, to make payments to ViaSat as provided in the Promissory Note.

41.    ViaSat fully performed its obligations under the Promissory Note, and all conditions required for SiriCOMM's performance have occurred.

42.    As set forth herein, SiriCOMM breached the Promissory Note by failing to make required payment.

43.    As a direct and proximate result of SiriCOMM's breach, ViaSat has been damaged in an amount in excess of the jurisdictional minimum of this Court, and is entitled to recover all amounts due ViaSat under the terms of the Promissory Note.

**THIRD CLAIM FOR RELIEF**

**(Declaratory Relief Against SiriCOMM)**

44.    ViaSat realleges and incorporates by reference as though fully set forth herein each and every allegation of paragraphs 1 through 43.

45.    A present and actual controversy has arisen and now exists between ViaSat and SiriCOMM concerning their respective rights and duties under the Service Agreement and Promissory Note.

46.    ViaSat contends that it has provided SiriCOMM with any and all required notice and opportunity to cure under the Service Agreement, and that ViaSat is justified in discontinuing its own performance under the Service Agreement.  ViaSat further contends that the full amount of interest and principal are immediately due and payable under the Promissory Note, as provided therein.  SiriCOMM maintains that ViaSat is not permitted to discontinue

1  performance under the Service Agreement, because SiriCOMM has not been given ample

2  opportunity to cure.

3      47.    ViaSat desires a judicial determination of the rights and duties of the parties, and

4  a declaration as to which party is correct. Such a judicial declaration is necessary and

5  appropriate at this time, under the circumstances alleged herein, in order that ViaSat may

6  ascertain its rights and duties.

7                    **PRAYER FOR RELIEF**

8      WHEREFORE, ViaSat prays for the following relief:

9      a.    Compensatory damages according to proof, including but not limited to the

10  amount of at least $1,153,305.10 due under the Promissory Note; the amount of at least

11  $590,640.00 due under Section 4 of the Service Agreement; and the amount of at least

12  $2,879,370.00 due under Section 12.3 of the Service Agreement;

13     b.    General, special, and consequential damages according to proof;

14     c.    A judicial declaration adjudging the parties' respective rights and obligations

15  under the Service Agreement and Promissory Note;

16     d.    Attorneys' fees and costs incurred herein; and

17     e.    Such other relief as the Court may deem just and proper.

18                    **JURY DEMAND**

19     ViaSat requests a trial by jury on all issues so triable.

20

21  Dated: November 19, 2007

22                    LATHAM & WATKINS LLP
                      Kenneth M. Fitzgerald
23                    Robert S. Huie

24

25                    By _____
                      Robert S. Huie
26                    Attorneys for Plaintiff
                      ViaSat, Inc.

27

28

LATHAM&WATKINSᴸᴸᴾ  SD\610682.1
ATTORNEYS AT LAW
SAN DIEGO                    9                                COMPLAINT

# SERVICE AGREEMENT

Between

ViaSat, Inc.

And

SiriCOMM, Inc.

Contract No. 051004

THIS SERVICE AGREEMENT is made and entered into as of this 14 TH day of June, 2004, with an "Effective Date" beginning June 14 , 2004 by and between **ViaSat, Inc.**, ("ViaSat"), 4356 Communications Dr., Norcross, Georgia 30093 and **SirICOMM, Inc.**, 2900 Davis Blvd., Suite 130, Joplin, Missouri 64804 ("Customer")

WHEREAS, Customer desires to purchase from ViaSat certain Services associated with the operation of Customer's Network.

WHEREAS, Customer may also desire to purchase from ViaSat certain Network Hardware associated with the operation of Customer's Network.

NOW THEREFORE, in consideration of the premises and the mutual promises hereinafter stated and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **PURCHASE AND SALE**

Subject to the terms and conditions of this Agreement, ViaSat shall sell and provide, and Customer shall purchase and pay for, Services and/or associated Network Hardware for Customer's Network, as described in the attached exhibits, which are incorporated herein and made a part of this Agreement:

Exhibit A:  Service Pricing
Exhibit B: Shared Hub Services and Technical Support
Exhibit C:  Satellite Bandwidth
Exhibit D:  On-Site Maintenance – Remote Terminal
Exhibit E: Move, Add and Change (MAC) Activity

2.    **DEFINITIONS**

2.1    "Agreement" shall mean this Service Agreement and all Exhibits attached hereto.

2.2    "Agreement Year" shall mean the twelve-month period commencing on the Effective Date of this Agreement and each successive twelve-month period thereafter that the Agreement remains in effect.

2.3    "Covered Software" shall mean Software, which is provided to Customer by ViaSat.   Covered Software includes maintenance releases provided to Customer without additional charge in accordance with the terms of this Agreement.

2.4    "Customer's Network" shall mean the satellite network purchased by Customer from ViaSat.

2.5    "Network Hardware" shall mean the equipment that is provided to Customer by ViaSat and on which runs the Covered Software.

2.6    "Services" shall mean the services as described in the Exhibits attached to this Agreement.

2.7     "Software" shall mean instructions for effecting the operation of a computer or like device including any modifications, updates or additions which may be supplied by ViaSat to Customer, in executable form in any medium, such as magnetic tape, disks, or optical media; and related materials such as flow charts, logic diagrams, manuals, and other documentation which are provided by ViaSat to Customer.

2.8     "Warranty Period" shall mean the time periods set forth in Section 7.

**3.      TERM.**

Unless sooner terminated in accordance with this Agreement, the term of this Agreement shall commence on the Effective Date and continue for sixty (60) months (the "Term").  This Agreement shall automatically renew for additional twelve (12) month periods, unless either party provides the other party with written notice at least ninety (90) days prior to the end of each period.

**4.      PRICE AND PAYMENT**

4.1     Customer shall pay for purchased Services and/or Network Hardware at the prices (the "Prices") set forth in Exhibit A attached hereto for a total of 400 sites.

4.2     The Prices for the Services and/or Network Hardware shall be fixed. Base charges do not include freight, insurance, taxes, duties, charges, levies and imposts.

4.3     Payment shall be made in U.S. dollars.  Terms are net thirty (30) days from the date of the invoice.  Payments shall be made as set forth below:

> If by check to:
> ViaSat, Inc.
> P.O. Box 512860
> Los Angeles, CA 90051-2860
>
> If by electronic wire transfer to:
> Union Bank of California
> 530 "B" Street
> San Diego, CA 92101-4407  USA
> Routing Transit #:  122000496
> Acct Name:  ViaSat, Inc. General Checking Account
> Acct #:  4000142625
> Swift ID:  BOFC US 33 SOC          (For international wire transfers)

4.4     A service charge of 1.5% per month or the highest rate permitted by law (whichever is less) plus reasonable collection charges including attorneys' fees will be applied to all invoices not paid within thirty (30) days from the date of invoice.  If Customer disputes in good faith any billing from ViaSat, Customer must notify ViaSat in writing within twenty (20) days after receipt of the invoice as to the basis for Customer's belief that the disputed amount is not payable. Interest will not accrue on the disputed amount if it is determined that the amount in dispute should not have been billed to Customer.  Interest will accrue on late payments if Customer fails to notify ViaSat in writing within such twenty (20) days, or if final resolution is that the disputed amount is owed to ViaSat.

4.5     Except as otherwise provided in this Agreement, at the end of the initial Term of this Agreement, ViaSat may increase the Pricing for the subsequent years, based upon the increase in the US Consumer Price Index and the Pricing hereto shall be deemed to have been amended thereby.

4.6     ViaSat reserves the right to suspend provision of any or all Services until payment in accordance with this Agreement, including payment for Services and all interest owed, is received by ViaSat.

4.7     Invoices for Services performed by ViaSat shall be sent to Customer at the following address:

SiriCOMM, Inc.
2900 Davis Blvd., Suite 130
Joplin, Missouri 64804
ATTN: Hank Hoffman

## 5.     TAXES

5.1     Customer shall be financially responsible for, and agrees to pay, all Taxes (as defined below) imposed on, or otherwise related or attributable to, the Services and/or Network Hardware or amounts payable by Customer to ViaSat pursuant to this Agreement, whether or not any such Taxes are actually charged or separately stated by ViaSat. For purposes of this Section 5, the term "Tax" or "Taxes" shall mean all federal, state, local, foreign, tribal or provincial taxes, charges, fees, levies, imposts, duties, tariffs, surcharges, or other assessments, including, without limitation, sales, use, transfer, gross receipts, excise, withholding, Universal Service Fund assessments or any similar charges or assessments, value added, goods and services, government fees on user terminals, and all assessments or replacing, any of the above, or other tax or governmental fee of any kind whatsoever imposed by any governmental authority, including any interest or penalties or additions thereto, whether disputed or not, *provided, however,* that the term Tax or Taxes shall not include any taxes imposed on ViaSat's net income. ViaSat's failure to collect and remit any Taxes required to be paid by Customer will not relieve Customer of its liability for such Taxes.

5.2     Customer shall provide ViaSat with all applicable certificates of waiver, exemption, relief, or other reasonably satisfactory evidence of waiver, exemption or relief that may be required by any federal, state, local or foreign Tax authority pursuant to which ViaSat would be relieved of its obligation to charge Customer Tax in connection with this Agreement.

## 6.     PERMITS AND LICENSES

6.1     Customer shall obtain and maintain, at its own expense, all necessary local regulatory and legal authorizations, licenses, approvals, certifications and permits, governmental or otherwise, necessary for Customer and its employees and agents to use the Services and/or Network Hardware.

6.2     No license under patents (other than the limited license to use), or license in copyrights, trade secrets, or other intellectual property rights is granted by ViaSat or shall be implied or arise by estoppel, with respect to any Service and/or Network Hardware offered under this Agreement.

## 7.     WARRANTY



7.1    ViaSat warrants that Services will be performed in a workmanlike manner in accordance with good commercial practices, by qualified personnel. Any Network Hardware furnished pursuant to this Agreement shall be new or refurbished and during the Warranty Period shall conform in all material respects to the published specifications in effect on the date such Network Hardware is shipped to Customer.

7.2    The warranty period begins on the date of delivery for Network Hardware (furnished pursuant to this Agreement) and extends for twelve (12) months. The warranty period for Covered Software is the term of this Agreement. ViaSat will repair or replace, at its option, any Network Hardware (furnished pursuant to this Agreement) and Covered Software returned to ViaSat by Customer at its expense during the Warranty Period, which fails to satisfy this warranty, unless the failure was the result of shipping; improper installation, maintenance or use by Customer; abnormal conditions of operation; tampering; power failures or surges; spurious radiation; attempted modification or repair by the Customer; or an act of God. ViaSat makes no warranties other than the express warranties in this section and none shall be implied. There is no warranty of noninfringement, merchantability, or fitness for a particular purpose provided hereunder. Customer's sole remedy for any breach of warranty is the repair or replacement, at ViaSat's option, of the failed item or re-performance of the non-conforming service.

7.3    In addition, ViaSat shall not be responsible for:

    a.  Any repair resulting from persons other than ViaSat service personnel performing maintenance, repairs or modifications without prior written approval by ViaSat.

    b.  Service on machines, accessories or other devices not manufactured by ViaSat, other than Network Hardware. If such damage is determined by ViaSat to be the cause of a malfunction in Covered Software, the Customer will be charged a service fee based upon ViaSat 's then current hourly rates.

    c.  Any Covered Software transferred from the location set forth in this Agreement, may result in such Covered Software being excluded from this Agreement or an additional charge will be levied for the contracted  Services unless prior approval in writing has been obtained from ViaSat.

    d.  ViaSat shall not be liable for any damage caused to Customer's facilities or equipment or for any loss resulting there from except for damage caused as a direct result of the accidental or negligent acts or omissions of its employees, servants and/or agents while on-site at Customer's facilities.

    e.  The Covered Software has the capability to run, or interact with, Software applications or hardware that were not provided by ViaSat; e.g. the Covered Software may provide inputs to third party custom billing systems. ViaSat is not responsible for the proper operation of third party applications or hardware, including without limitation billing systems, and cannot give assurances that a failure of third party applications or hardware will not cause the Covered Software to malfunction.

**8.    FORCE MAJEURE**

    Except for Customer's obligation to make timely payments, no Party hereto shall be liable for delay in performance or for non-performance caused by circumstances beyond the control of the party affected, including for example but not limited to, acts of God, fire, flood, war,



government action, accident, technical failure, labor trouble, acts or omissions of communications carriers, unauthorized use of the Services, shortages, inability to obtain materials, equipment or transportation from suppliers or subcontractors when such inability is due to causes of Force Majeure on the part of the affected Party's suppliers or subcontractors; provided, however, that the party so affected notifies the other party in writing as soon as possible of the existence of such condition. In the event of delay due to any such condition, any performance obligation shall be adjusted equitably.

9. **INDEMNIFICATION; LIMITATION OF LIABILITY**

9.1     Each party shall indemnify and hold harmless the other, its directors, officers, employees, agents, subsidiaries, affiliates, subcontractors and assignees, or any of them, from and against any losses, damages, liabilities, expenses, costs, claims, suits, demands, actions, causes of action, proceedings, judgments, assessments, deficiencies and charges on account of physical damage to tangible property and personal injuries, including death, to all persons, arising from any negligent actions or omission or willful misconduct of the party. Provided Customer promptly notifies ViaSat, in writing, of such claims, and provided Customer gives ViaSat the right to defend and/or settle such claims at its expense with counsel of its choice, ViaSat shall indemnify and defend Customer, its directors, officers, employees and agents from and against any claim, action, damage, liability and expense arising out of or in connection with claims for patent infringement arising from the Service furnished by ViaSat (other than claims for patent infringement arising from Customer combining or using the Service furnished by ViaSat in connection with facilities or equipment furnished by others). The indemnification provisions set forth in this Section 9 extend to and include any attorney's fees and costs incurred by such parties from any actions or claims to which this indemnification applies, or from contesting the applicability of this provision.  This Section 9 shall survive the termination of this Agreement.

9.2     Notwithstanding any other provision of this Agreement, under no circumstances shall ViaSat or Customer be liable for any incidental, consequential, punitive or special damages of any nature whatsoever, including without limitation, lost profits, loss of information, loss of business, or cost of replacement services, however caused, whether for breach of warranty, breach of contract, repudiation of contract, or in tort, or otherwise, whether or not previously advised of the possibility of such damages.   In no event shall ViaSat's total liability in connection with the performance of this Agreement exceed an amount equal to the amount paid by Customer to ViaSat during the six (6) months immediately preceding the date on which Customer suffers any damages.   This Section shall survive the termination of this Agreement.

10. **PROPRIETARY INFORMATION AND RIGHTS**

All patents, trademarks, trade names, copyrights and designs in relation to the Services and/or Network Hardware whether registered in any part of the Customer's country or province or not shall be and remain the property of ViaSat and Customer shall not claim any right or property therein or register or cause to be registered in any part of the world, any patent, trademark, trade name, copyright or design which is the property of ViaSat.  ViaSat retains for itself all intellectual property and production rights in and to all designs, engineering details, software and other data pertaining to the Services and/or Network Hardware. Intellectual property includes, without limitation, patents, copyrights, trade and service marks, trade names, trade secrets, software and semiconductor designs. Customer shall not remove, destroy, deface, conceal or alter any name, markings, copyright, notice, number or the like on or contained in or attached to the Services and/or Network Hardware or alter or modify the Services and/or Network Hardware without the prior written consent of ViaSat.

Nothing herein in this Agreement shall be deemed to grant to Customer any right, title, license or interest in the word or name "ViaSat" or in any other trademark, trade name, trade dress, or logo of ViaSat.

## 11.    NOTICES

All notices given pursuant to this Agreement shall be in writing and either delivered in person or by certified Mail, return receipt requested postage prepaid, or by overnight courier requiring signature upon receipt to each party at the following address or such other address as such party may direct by similar notice to the other:

To ViaSat:

ViaSat, Inc.
4356 Communications Dr.
Norcross, Georgia 30093 USA
ATTN:  Director of Contracts - Brad Malloch

with a copy to:

ViaSat, Inc.
4356 Communications Dr.
Norcross, Georgia 30093 USA
ATTN: Managing Director, World Wide Service - Phil Yeakel


To : CUSTOMER:

SiriCOMM, Inc.
2900 Davis Blvd., Suite 130
Joplin, Missouri  64804 USA
ATTN:  Hank Hoffman

Any notice given pursuant to this Agreement shall be deemed to have been given on receipt.

## 12.    TERMINATION

12.1    ViaSat may terminate this Agreement in the event that Customer breaches a material obligation of this Agreement and such breach continues for a period of sixty (60) days after ViaSat provides Customer a written notice thereof, setting forth the nature of the alleged breach. Customer and ViaSat agree to a good faith effort to remedy such breach during this sixty (60) day period.

12.2    Customer may terminate this Agreement in the event that ViaSat breaches a material obligation of this Agreement and such breach continues for a period of sixty (60) days after Customer provides ViaSat a written notice thereof, setting forth the nature of the alleged breach. Customer and ViaSat agree to a good faith effort to remedy such breach during this sixty (60) day period.

12.3    Should the Agreement be terminated, pursuant to this section, for breach of a material obligation of the Customer, Customer shall be obligated to immediately pay to ViaSat all fees normally charged for the Services for the remaining balance of the Term of this Agreement. Also any additional payments due by the Customer to ViaSat will be paid by the Customer in



accordance with Section 4.3. Should the Agreement be terminated, pursuant to this section, for breach of a material obligation of ViaSat, a refund, adjusted for actual Services provided, less any outstanding invoices, will be paid to the Customer by ViaSat.

12.4    Termination will entitle ViaSat to cancel any or all undelivered orders for Service activation or Technical Support Services without liability or obligation.

## 13.    INSURANCE

13.1    Each of ViaSat and Customer shall:  (a) at its own expense, maintain in full force and effect Worker's Compensation Insurance for its own employees, providing coverage in accordance with the statutory limits prescribed for the installation site; (b) require its subcontractors to maintain Worker's Compensation Insurance in accordance with the statutory limits prescribed for the installation site; and (c) provide the other party with a copy of the certificate of insurance upon request.

13.2    Each of ViaSat and Customer shall, at its own expense, maintain in full force and effect comprehensive general liability insurance with a combined single limit of liability of not less than $1,000,000 per occurrence. The parties shall provide the other party with a copy of the certificate of insurance upon request.

## 14.    ASSIGNMENT AND SUBCONTRACTING

14.1    This Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective legal representatives, successors and assigns, subject to the understanding that ViaSat may assign this Agreement to any entity acquiring all or substantially all of the assets of its VSAT Networks business unit.

14.2    ViaSat may engage one or more subcontractors to perform any or all of the obligations of ViaSat hereunder.

14.3    Subcontracting by either party shall not, unless the parties otherwise agree in writing, relieve the assigning or subcontracting party hereto from any obligations hereunder.

## 15.    GOVERNING LAW

This Agreement shall be interpreted in accordance with and governed by the laws of the State of California, except for its rules or principles of conflicts of law. The United Nations Convention on International Contracts for the Sale of Goods shall not apply.

## 16.    MISCELLANEOUS

16.1    This Agreement (and the Exhibits as integrated hereto) constitutes the entire agreement between the parties with respect to its subject matter, and supersedes all other agreements, understandings and contracts whether oral or written with respect thereto.  No modification, change, amendment to this Agreement shall be of any force or effect unless in writing and signed by authorized representatives of both Parties.

16.2    The waiver or failure of any Party hereto to exercise any right provided for in this Agreement shall not be deemed a waiver of any further right hereunder under such provision or any other provisions.  If any provision of this Agreement shall be held to be invalid or unenforceable, the other provisions shall remain in full force and effect.



16.3    Customer agrees that except as may be required by law, there shall be no news releases, advertising, sales promotions, or disclosures of a technical nature or otherwise regarding this Agreement or which involve the name of ViaSat without the prior written approval of an authorized employee of ViaSat, such approval not to be unreasonably withheld.

16.4    All provisions contained in this Agreement which by their language or context are intended to survive, such as, without limitation, ownership and confidentiality of proprietary information, indemnification and payment provisions, shall survive any termination of this Agreement.

16.5    Nothing in this Agreement shall, expressly or implied, give to any person other than the parties hereto any benefit or legal or equitable right, remedy or claim except as expressly provided herein.  All remedies provided in accordance with this Agreement are cumulative and are in addition to any and all legal rights of the parties except as are expressly limited by the terms hereof.

16.6    To the extent any terms and conditions of this Agreement conflict with the terms and conditions of the Exhibit(s), an order or order acknowledgement, the terms and conditions of this Agreement shall control.

16.7    The captions contained in this Agreement are for convenience only, are without substantive meaning, and shall not be construed to modify, enlarge, or restrict any provision.

16.8    This Agreement may be executed in any number of counterparts, and by ViaSat and Customer in separate counterparts, each of which shall be an original, but all of which shall together constitute one and the same Agreement.


IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.


ViaSat, Inc.

By: _____

Printed
Name: _____BRAD MALLOCH_____

Title: _DIR. OF BUSINESS DEVELOPMENT-
             CONTRACTS

SiriCOMM, Inc.

By: _____

Printed
Name: _Henry P. Hoffman_

Title: _President_

**EXHIBIT A**
**SERVICE PRICING**

1.  **SCOPE**

    ViaSat shall provide the Services as described in Section 2 at the prices contained in Section 3 and in accordance with the schedule contained in Section 4.

2.  **SERVICES**

    As a part of this Agreement, ViaSat shall provide the below Services:

| SERVICES: | | |
|---|---|---|
| **Included in Offering** | **Item** | **Contract Exhibit** |
| No | Installation – Standard Non-Penetrating Roof Mount | N/A |
| Yes | Shared Hub Services and Technical Support | B |
| Yes | Internet access for the initial service via a ViaSat provided portal | N/A |
| No | Backhaul Connection to ViaSat Shared Hub | Customer Provided |
| Yes | Satellite Bandwidth to support:<br>• 1.536 Mbps Multicast Forward Channel<br>• 64, 128 or 192 kbps peak Unicast Return Channel Data Rate with 32, 64 or 96 kbps dynamic CIR (assumes 50:1 oversubscription)<br>• 256, 512 or 768 kbps Unicast Forward Channel Dynamic CIR (assumes 50:1 oversubscription)<br>Note: Additional satellite bandwidth can be made available at the following monthly rates:<br>• Download capacity - $650 per 100 kbps channel<br>• Upload capacity - $2,650 per 256 kbps channel, $5,250 per 512 kbps channel or $10,400 per 1028 kbps channel | C |
| Yes | On-Site Maintenance – Next Business Day , Monday through Friday | D |
| No | Disaster Recovery Hub Support | N/A |
| As Required | Move, Add and Change (MAC) Activity | E |
| As Required | Hosting at ViaSat's Shared Hub a VPN or Frame Relay Interface Router not to exceed a height of 2 RUs | A- Option |



3.    **PRICING**

3.1    **FEES FOR SERVICES**

The pricing paid by the Customer is based on the configuration at each site location:

| Data Rates (Download/Upload) | Monthly Recurring Price Per Site |
|---|---|
| 256/64 kbps | $95.00 |
| 512/128 kbps | $128.00 |
| 768/192 kbps | $160.00 |

The above pricing is based on a total of 400 sites having a contract term of sixty (60) months each. The pricing also assumes that the 400 sites will be installed over a period f not more than six (6) months. ViaSat shall commence invoicing the above fees upon installation and commissioning of each Remote Terminal.

3.2    **ADDITIONAL SERVICES**

| Equipment or Service Item | Price |
|---|---|
| Customer Network Equipment Hosting Fee ( 2 Rack RUs or less) | $195.00/month |
| Additional NATed static public IP addresses beyond the initial 1 ea. | $ 50.00 each |
| | |
| | |
| | |

**EXHIBIT B**
**SHARED HUB SERVICES AND TECHNICAL SUPPORT**

1. **SCOPE**

Through the use of a Shared Hub, ViaSat provides services to enable Customer to transmit and receive information between Customer's centralized computing equipment and the end user Remote Terminal. Customer's use of the ViaSat owned Shared Hub and the associated NOC support that is provided (hereinafter referred to collectively as the "Shared Hub Services") are as follows:

A.    ViaSat shall provide Customer with access to the Shared Hub through an interface purchased and installed by the Customer;

B.    ViaSat shall transmit to the Remote Terminals information received at the Shared Hub from Customer's centralized computing equipment and will transmit to Customer's centralized computing equipment information received at the Shared Hub from the Remote Terminals. Customer shall obtain the required space segment capacity for satellite transmission;

C.    ViaSat shall provide routing and switching of information between Customer's centralized computing equipment and the Remote Terminals;

D.    ViaSat shall operate, monitor and control the Shared Hub 24 X 7 with resources from ViaSat's NOC.

The Shared Hub is a fully redundant system located in Atlanta, Georgia. The facility consists of a 6.1 meter Ku-band motorized antenna with satellite tracking, redundant RF, automatic uplink power control, redundant base band equipment, DS3 Internet access, and voice trunking capability. The facility is housed in a secure environment with FM 200 fire suppression system, 30-day diesel generator and uninterruptible power system.

For operation of the Shared Hub, ViaSat provides 24 X 7 technical support through a combination of our worldwide Network Operations Center (NOC) and our staff of systems and development engineers.

ViaSat's technical support staff consists of qualified personnel who are properly trained and are duly qualified to provide appropriate levels of assistance. ViaSat's staff shall assist Customer with operation and management of the ViaSat furnished equipment and software. Technical Support personnel are available by phone, email or Fax. The Technical Support staff consists of qualified engineers capable of problem resolution, remote diagnostics, trouble-ticket assignment and tracking, and problem diagnosis and action. In the event the problem cannot be diagnosed and corrected it shall be escalated to systems and development engineers in accordance with the SLA defined in this document.

The technical support staff shall maintain in electronic format copies of any software maintenance releases or upgrades to the system software and firmware. Additional, the technical support staff shall maintain both an electronic and hardcopy version of the operation

and maintenance manuals, application notes, software installation procedures, and detailed prints for any custom or non-standard components. Quarterly reports shall be generated by the technical support staff depicting the volume of calls received and the number and status of Service Tickets opened.

## 2.    DEFINITIONS

**"Technical Support"**, means engineering and operational support provided by ViaSat's Network Operations Center staff located in Carlsbad, California and our staff of systems and development engineers at our Atlanta, Georgia and Clarksburg, Maryland locations.

**"NOC"**, means the Worldwide Network Operations Center located in Carlsbad, California.

**"Service Ticket"**, means an electronic record that is established and periodically updated when a problem or request is made to the NOC.  Each Service Ticket shall be assigned a unique number for tracking purposes.

**"Shared Hub"**, means a satellite master earth station owned by ViaSat that provides the central link for Customer's network.

**"Shared Hub Services"**, means Customer's use of the ViaSat owned Shared Hub and the associated NOC support that is provided.

## 3.    REFERENCES AND ATTACHMENTS

Attachment 1 – Customer Request for Service

## 4.    PROCESS FOR OBTAINING TECHNICAL SUPPORT

## 4.1    SUPPORT REQUEST

Requests for Technical Support shall be made by telephone, fax or e-mail to the Worldwide NOC.  The contact information for support is as follows:

| ITEM | WORLDWIDE NOC |
|---|---|
| ADDRESS | ViaSat Network Operations Center ViaSat Inc. 6155 El Camino Real Carlsbad, CA 92009-1699 USA |
| TELEPHONE NUMBER | +1-760-476-2600 |
| FAX NUMBER | +1- 760-929-3931 |
| E-MAIL ADDRESS | noc-carlsbad@viasat.com |
| LANGUAGES SUPPORTED | English |
| HOURS OF OPERATION | 24 X 7, 365 days per year |



When contacting the NOC, each request for support should be communicated providing the information requested in Attachment 1. This information includes contact information for the requestor, a description of the problem, information on the network impact of the problem and any other relevant information. This information shall allow the NOC to better understand the nature of the problem and the severity.

Some of the more typical reasons for contacting the NOC include:

1. Troubleshooting site problems
2. Assistance with software upgrades including telephone support and upgrade planning assistance
3. Monitoring and diagnostics of network performance
4. Network optimization and sizing analysis
5. Assistance in adding or deleting carriers
6. Moving to a new transponder or satellite
7. Network problem diagnosis, recommendations and resolution
8. Network optimization
9. Adding or deleting carriers
10. Field-testing of new ViaSat software releases with Customer applications.

From time to time Customer may request ViaSat to provide additional support outside the scope of the typical support provided by the NOC. This support may include implementing new applications or third party hardware, network configuration changes, etc. ViaSat shall evaluate these changes and provide Customer a quotation for these types of services. If the Customer performs the Remote Terminal installation then it is the Customer's responsibility to ensure that all installers are properly certified to install the equipment. ViaSat shall not be responsible for any support to improperly trained individuals.

## 4.2    SERVICE TICKETING AND SEVERITY LEVELS

When contacted by Customer, the NOC shall immediately log the problem/request and open a Service Ticket in the service-ticketing database. ViaSat's technical personnel shall evaluate each service request and apply the following levels of problem severity when prioritizing the level of technical response:

**Severity 4** - Failure is an irritant only and does not materially affect the operation of the system. Also includes non-priority questions and items relating to documentation questions.

**Severity 3** - Failure is an error or failure of the licensed software or equipment items, which materially affects the operation of the system, but does not prevent the operation of a significant portion of the system. A significant portion of the system is defined as fifty percent or greater of the sites impacted.

**Severity 2** - Failure prevents operation of a significant portion of the system.

**Severity 1** - Failure prevents the operation of the entire network.

Once the problem has been logged into the Service Ticketing system and the severity determined, the NOC shall provide the person requesting support a Service Ticket number, and the appropriate level of support shall be assigned to the service request.



As appropriate the NOC may request dial/Internet access to Customer's network to perform remote diagnostics. It's critical and essential that Customer always maintain the capability for NOC personnel to access the network.

## 4.3    SUPPORT TIER LEVELS

### 4.3.1    CUSTOMER SUPPORT SERVICES

Customer shall provide first-line service and Technical Support to their end users.   Customer shall initially address requests for support before contacting ViaSat. The minimum services Customer shall provide their end users are: (i) call center services, (ii) fault isolation and problem resolution, (iii) continuing software and documentation updates, and (iv) service-ticket tracking.  If Customer is unable to resolve any issue, then ViaSat shall be contacted by authorized callers to obtain needed assistance.

### 4.3.2    VIASAT SUPPORT SERVICES AND TIER LEVELS

Based on Customer providing initial support for their end users through a call center, ViaSat provides three (3) tiers of NOC Technical Support:

**Tier 1** - This tier level is the primary point of contact within the NOC and provides problem resolution, remote diagnostics, Service Ticket tracking, problem diagnosis and action; satellite downloads of new software and escalation to tier 2 if required.  Tier 1 services are available 24X7 and are subject to the escalation procedure contained in Section 4.4.

**Tier 2** -  This tier provides Customer enhanced service and Technical Support depending upon the nature and severity of the issue.  Tier 2 is available 24X7 for severity level 1 & 2 problems and emergencies in accordance with the escalation procedure contained in Section 4.4.

**Tier 3** -  This tier provides Customer service and Technical Support for issues that cannot be resolved at tier 2.  Tier 3 support is typically provided by senior level System and Design Engineers. These issues may require system optimization to correct deficiencies that can cause network service outages. Tier 3 support is available 24X7 for severe level 1 & 2 problems and emergencies in accordance with the escalation procedure in Section 4.4.

Customer support for non-emergency requests and technical questions shall be addressed during normal business hours, five (5) days per week.

## 4.4    ESCALATION AND SERVICE LEVEL AGREEMENT

Based on the severity of the problem as defined in Section 4.2, ViaSat shall escalate the problem and have a temporary and final solution in place in accordance with the below table.



*Table 4.4.  Hardware and Software Problem Escalation*

| Severity Category | 1st Tier Maximum Response Time | 2nd & 3rd Tier Maximum Response Time | Maximum Time For Temporary Solution In Place | Final Solution In Place |
|---|---|---|---|---|
| 4 | Immediate – Available 24 X 7 Via Phone | 7 days | N/A. | Future Release Of Hardware Or Software |
| 3 | Immediate – Available 24 X 7 Via Phone | 72 hours | 30 days | Next Release Of Hardware Or Software |
| 2 | Immediate – Available 24 X 7 Via Phone | 4 hours | 9 hours | Next Release Of Hardware Or Software |
| 1 | Immediate – Available 24 X 7 Via Phone | 1 hour | 6 hours | Next Release Of Hardware Or Software |

Hardware and Software Problem Escalation Notes:

1. Above stated hours are non cumulative.

2. The beginning of each time interval stated above is from the time Customer contacts the NOC and a Service Ticket is opened; and only after Customer has performed trouble diagnosis and attempted problem resolution.

## 4.5    RESOLUTION OF SERVICE REQUEST

Upon completion, correction, restoration, or other resolution of Customer's request for service from the NOC, the NOC shall record the diagnosis of the issue, any actions taken by the NOC to resolve the issue, the date and time of resolution, and the man hours invested by the NOC in resolving Customer's issue from the time the service ticket was initially opened.

The steps taken by the NOC during the resolution process include:

1. Issuance of a Service Ticket number for tracking of the problem

2. Engaging Tier 2 or 3 Engineers as required and providing Customer the name of the assigned Engineer for coordination purposes

3. Tier 2 or 3 Engineer upon receipt of an assignment shall contact Customer to obtain additional information concerning the problem and shall agree with Customer on the frequency and methods of providing updates.

4. Tier 2 or 3 Engineer provides status updates to Customer based on the intervals agreed to in item 3 above.

5. Upon resolution of a problem, an e-mail shall be sent to Customer detailing the corrective action and the Service Ticket shall be closed.



**Attachment 1**

**Customer Request for Service**

| |
|---|
| **Company Name:** <br> **Name of Requestor:** <br> **Phone:** <br> **Fax:** <br> **Email:** |

Product Type:                              Version of Software: _____
Hub Location:

**Describe Issue:**


**Impact of Issue:** (Please note if issue is intermittent, routine, etc.)
On Hub or NMS:


On Remotes:


**Questions:**

What changes (if any) have been made to network?


Any new applications introduced into network, if so, when?


**General Relevant Facts or Comments:**

**EXHIBIT C**
**SATELLITE BANDWIDTH**

1. **SCOPE**

   ViaSat shall provide Customer Satellite Bandwidth for communications services via satellite within the fifty United States and portions of Canada, Mexico and the Caribbean. The Satellite Bandwidth shall be in the Ku-Band frequency range and be Transponder Protected

2. **DEFINITIONS**

   **"Satellite Bandwidth"**, means Ku-band bandwidth on a domestic US Satellite.

   **"Transponder Protected"**, means satellite service that may not be preempted to restore another Customers service or transponder

3. **NETWORK CHARACTERISTICS**

   The Satellite Bandwidth provided by ViaSat to Customer is based on the LinkStar system which provides connectivity using a DVB/S broadcast outbound carrier from the hub and one or more proprietary format TDMA return links from the Remote Terminal back to the hub.

4. **PROVIDED BANDWIDTH**

   Satellite Bandwidth shall be provided Customer for the initial number of Remote Terminals, and the Satellite Bandwidth can be increased to meet Customer's site and application growth. The Satellite Bandwidth will be divided between download (towards Remote Terminal) and upload (towards hub) capacity.



**EXHIBIT D**
**ON-SITE MAINTENANCE – REMOTE TERMINAL**

1. **SCOPE**

By purchasing on-site maintenance, the Equipment supplied by ViaSat shall be repaired or replaced by a service technician visiting Customer site if there is an Equipment failure. The services provided by ViaSat include NOC diagnostics, service technician dispatch, travel to the site, spares to replace failed Equipment, repair of failed Equipment, shipping and warehousing.

Problems may be reported to the NOC, 24 x 7, by calling the toll-free number: 888-272-7232, or direct, 760-476-2600. The NOC shall issue a unique call identifier to document the reported issue and to track actions taken toward resolution of the problem. The NOC shall perform preliminary troubleshooting and diagnostics; and as required shall dispatch service technicians to Customer's site.

2. **SERVICE OFFERING**

ViaSat offers both same day and next day service. The level of service shall be determined at the time of contract and can be changed on an annual basis. Each service offering is described below.

2.1 **SAME DAY SERVICE**

ViaSat shall provide maintenance the same day the maintenance request is received from the Customer. The level of service provided will be selected by the Customer based on the site hours and the criticality of returning the site to full operation. The three levels of same day service are described below:

| LEVEL | MAINTENANCE DAYS | HOURS OF MAINTENANCE | *ARRIVAL TIME |
|-------|------------------|----------------------|---------------|
| A | 7 days per week | 24 hours per day | 5 hours from receipt of maintenance request |
| B | 7 days per week | 8:00 AM – 8:00 PM local time | 5 hours from receipt of maintenance request |
| C | Monday - Friday | 8:00 AM – 5:00 PM local time | 5 hours from receipt of maintenance request |

\* Time outside the hours of maintenance shall not be included when determining the 5-hour response time. As an example, if Level C service is requested and the request is received at 4:00 PM then ViaSat shall be on site by 12:00 noon the following day (1 hour is counted from 4:00 PM to 5:00 PM and then 4 hours from 8:00 AM to 12:00 AM). For a Level A service, ViaSat shall be on site by 9:00 PM the same day.



## 2.2    NEXT DAY SERVICE

ViaSat shall provide next day maintenance for those sites designated by Customer. Customer shall select from the below two levels of support offered by ViaSat:

| LEVEL | MAINTENANCE DAYS | *ARRIVAL TIME |
|-------|------------------|---------------|
| A | 7 days per week | For those sites serviced by Fed Ex/UPS next day AM service, ViaSat shall arrive on site the next day by 10:00 AM local time, for service calls received by 4:00 PM the previous day. If the site doesn't have AM service, ViaSat shall arrive on site by 4:00 PM or within 2 hours of replacement Equipment delivery. |
| B | 5 days per week Monday - Friday | For those sites serviced by Fed Ex/UPS next day AM service, ViaSat shall arrive on site the next day by 10:00 AM local time, for service calls received by 4:00 PM the previous day. If the site doesn't have AM service, ViaSat shall arrive on site by 4:00 PM or within 2 hours of replacement Equipment delivery. |

\* Days outside the maintenance days shall not be included when determining the next day response time. As an example if Level B service is requested and the request is received on Friday, ViaSat shall be on site by 10:00 AM Monday. For a Level A service call, ViaSat shall be on site by 10:00 AM Saturday.

## 2.3    Restoral Time

When the ViaSat service technician arrives on site with the appropriate spare equipment, normal service shall typically be restored within two (2) hours of the technician arriving on site. Normal escalation procedures to be followed by ViaSat are:

a.  If the field service technician cannot repair or otherwise resolve the hardware maintenance problem within two (2) hours after arrival on-site, the technician shall contact the ViaSat Network Operations Center (NOC) supervisor.

b.  If the problem cannot be identified within three (3) hours after the field service technician's arrival on-site, the NOC shall report the problem to a Level II Engineer.

c.  If the problem is not identified within four (4) hours after the field service technician's arrival on-site, the Manager of Network Operations shall be notified and an appropriate course of action shall be discussed with Customer.

d.  With respect to ViaSat dispatches of service technicians to a site, ViaSat shall cause ninety percent (90%) of such dispatches to arrive to the site within the designated on-site time.

## 3.    Maintenance Exclusions

ViaSat's maintenance coverage under this Agreement is all inclusive with the exception of (i)



repairs resulting from damage or improper use or operation other than in accordance with the operating manuals, including the failure to keep the equipment free from dust, grime, water or other liquids, or failure to provide sufficient airflow or supply of power free from significant or frequent power surges; acts of God; power failure; fire; flood; water; lightning; vandalism, as long as the cause is not created by ViaSat or the agents of ViaSat, (ii) if access is denied to service technician then an abort fee shall apply,  (iii) non ViaSat authorized alterations, such as antenna moves due to roof work or Customer performed antenna moves, (iv)  if it is determined upon arrival on site the problem is not with the installation of Equipment provided by ViaSat, any resulting service dispatches shall be billed to Customer on a time and materials basis, or (v) if ViaSat does not install the ViaSat provided equipment than any service calls as a result of improper installation shall be at extra cost.

*Bcm*

**EXHIBIT E**
**MOVE, ADD AND CHANGE (MAC) ACTIVITY**

## 1. SCOPE

From time to time Customer may require various services to be performed by ViaSat. Below is a list of the possible services and the associated price.

| SERVICE | DESCRIPTION | PRICE |
|---|---|---|
| Install New System | Phone Survey, install antenna, antenna mount, LNB, BUC, RCST, installing 100 foot IFL cable; point, peak& pol antenna, and 1 hour commissioning time/hook up of customer equipment. | .96m – $680<br>1.2m – $680<br>1.8m – $855<br>2.4m - $1,140 |
| Deinstall (Removal) | Disassembly and removal of antenna and mount from roof. Removal of electronics. Restoring site to original preinstallation condition | .96m - $650<br>1.2m – $650<br>1.8m – $825<br>2.4m - $1,110 |
| Abort Fee or Fee for Return Trip | Applies if installer was properly notified of the site and scheduled a date, traveled to the site and is then instructed to return at a later date to perform the service. Also applies if during a system move the installer is required to deinstall one day and return the next day for an installation | $400 |
| Antenna Move | Move antenna and mount to different location on same roof. Price includes roof pad if required. Price also includes installing up to 100 ft. of new IFL cable if required. Double the charge if two visits are required to deinstall and then reinstall on separate days. | .96m - $740<br>1.2m - $740<br>1.8m - $925<br>2.4m - $1,200 |
| New Cable (Installed) | Provide and install cable (price per foot) | $5.00 |
| Conduit | Provide and install conduit (price per foot) | $4.00 |
| Trenching | Trenching activities for IFL cable installation (price per foot) | $5.00 - Earth<br>$15.00 - Asphalt or Concrete |
| RCST Move | Power off RCST and move to new location. Includes possibility of rerunning up to 100 ft of IFL cable. Powering up RCST and re-commissioning site | $550 |
| RCST Move after hours | Same effort as above performed after 6:00 pm local time | $650 |
| Expedite fee | Requiring an installation to be done with same day notice | $250 |
| Roof Pad | Provide roof pad for a move or deinstall/reinstall where the older roof pad can't be reused | $200 |



| | | |
|---|---|---|
| Site Survey (Non concurrent with installation) | Pre-installation site visit to determine antenna location; mount type, cable routing, and terminal location. Includes: photographs, drawings, completed survey document and customer acknowledgement. | $350 |
| Deinstall/Reinstall - Same Location/Same Day | Move existing antenna and mount, cable, electronics at same site location. Price includes roof pad if required. Price also includes possibility of rerunning up to 100 ft of IFL cable. Powering up RCST and re-commissioning site | .96m – $1,330<br>1.2m – $1,330<br>1.8m – $1,680<br>2.4m - $2,250 |
| Deinstall/Reinstall – Different Location/Same Day | Move existing antenna and mount, cable, electronics to different location. Price includes roof pad if required. Price also includes possibility of rerunning up to 100 ft of IFL cable. Powering up RCST and re-commissioning site. Assume new site is within 25 miles of the old location. | .96m – $1,405<br>1.2m – $1,405<br>1.8m – $1,755<br>2.4m - $2,325 |
| Antenna Repoint | Repoint of an antenna on the same or different satellite | $350 |
| **Hourly Rates:** | | |
| Regular working hours | 6:00 am - 6:00 pm/ Monday-Friday | $85 |
| After hours, Saturday | 6:00 pm Friday to midnight Saturday | $125 |
| Sunday, holidays | Midnight Saturday till 8:00 am Monday | $150 |

Exhibit B



1725 Breckinridge Plaza
Duluth, GA 30096
USA
Tel: +1 (678) 924-2400
Fax: +1 (770) 935-3292

April 6, 2007

SiriCOMM, Inc.
2900 Davis Blvd., Suite 130
Joplin, Missouri 64804 USA

Attention:   Mr. Mark Grannell
             President and CEO

Subject:     Notice of Termination - Contract 051004, Service Agreement (the
             "Agreement")

Dear Mr. Grannell:

This letter is a formal notification that SiriCOMM, Inc. ("SiriCOMM") has breached a
material obligation of the above subject Agreement. SiriCOMM has failed to make
payments in accordance with Section 4.3 of the Agreement.

This letter is formal notification of ViaSat's intent to terminate the Agreement in 60 days
(June 6, 2007) in accordance with Section 12 of the Agreement. Per Section 12.1 of the
Agreement, SiriCOMM has sixty (60) days from the date of this notification letter to cure
the breach.

While ViaSat has continued to be in contact with SiriCOMM in an attempt to bring the
non-payment issues to a speedy resolution, the outcome of those discussions is still not
clear. ViaSat would like to affirmatively state that if ViaSat, in its sole opinion, deems
that reasonable progress is being made between the companies in resolving the
outstanding payment issues, ViaSat reserves the right to extend the above 60 day period
by separate notice. We look forward to resolving this issue as quickly as possible.

Please contact me at 678-924-2681 or email; brad.malloch@viasat.com should you have
any questions regarding this letter.

Regards,

*Robert Michalowski*

for  Brad Malloch
     Director, Contracts
     ViaSat, Inc.



1725 Breckinridge Plaza
Duluth, GA 30096
USA
Tel: +1 (678) 924-2400
Fax: +1 (770) 935-3292

June 5, 2007

SiriCOMM, Inc.
4710 East 32nd Street
Joplin, Missouri 64804 USA

Attention:     Mr. Mark Grannell
               President and CEO

Subject:       Extension - Notice of Termination - Contract 051004, Service Agreement
               (the "Agreement")

Dear Mr. Grannell:

On April 6, 2007 ViaSat, Inc. ("ViaSat") notified SiriCOMM, Inc. ("SiriCOMM") of our
intention to terminate the Agreement effective June 6, 2007 (see attached letter).

Although ViaSat has decided not to terminate the Agreement as of June 6, 2007,
SiriCOMM remains in material breach of the Agreement and therefore ViaSat reserves
the right at any time to immediately terminate the Agreement upon further written notice.
Any delay in providing further written notice to terminate the Agreement shall not
constitute a waiver of any of ViaSat's rights or SiriCOMM's obligations under the
Agreement.

ViaSat believes that the best way to resolve this issue is to make progress in resolving the
outstanding payment issues under the Agreement.

Please contact me at 678-924-2681 or email; brad.malloch@viasat.com should you have
any questions regarding this letter.

Regards,

Brad Malloch
Director, Contracts
ViaSat, Inc.


Attachment

## Promissory Note

$1,144,246.48                                                              June 22 2007

FOR VALUE RECEIVED, SIRICOMM INC., a Delaware corporation (*"Maker"*), hereby unconditionally promises to pay to the order of VIASAT, INC., a Delaware corporation (*"Lender"*), in lawful money of the United States of America and in immediately available funds, the principal sum of ONE MILLION ONE HUNDRED FORTY-FOUR THOUSAND TWO HUNDRED FORTY-SIX DOLLARS AND FORTY-EIGHT CENTS ($1,144,246.48), together with accrued and unpaid interest thereon, each due and payable on the dates and in the manner set forth below.

   1.    **Principal Repayment.** The outstanding principal and interest under this Note shall be due and payable in accordance with Schedule 1 attached hereto with the first payment being due on July 15, 2007 and subsequent payments being due on the 15th day of each month. All principal and interest hereunder shall be due on or before June 15, 2009; <u>provided</u> that in the event that an Event of Default (as defined in Section 8 below) occurs, all outstanding principal and accrued interest shall become immediately due and payable in accordance with Section 9 (the *"Maturity Date"*). This Note may be prepaid in whole or in part at any time without premium or penalty.

   2.    **Interest Rate.** Maker promises to pay interest on the outstanding principal amount hereof at an interest rate equal to the lesser of nine and one-half percent (9.5%) per annum or the maximum rate permissible by law. Interest shall be calculated on the basis of a 360-day year for the actual number of days elapsed. Notwithstanding the foregoing, as long as any payment due under this Note remains past due (whether at the stated maturity, by acceleration or otherwise), interest under this Note shall accrue on such overdue payment at an interest rate equal to the lesser of twelve percent (12%) per annum or the maximum rate permissible by law from the date of such non-payment until such amount is paid in full.

   3.    **Subordination, Warrants and Mandatory Prepayments.**

        (a)    By its acceptance of this Note, Lender acknowledges and agrees that all amounts payable and obligations due hereunder are expressly subordinate to any and all amounts and obligations now or at any time payable and/or or due under any and all loans and associated documents by, between and/or among Maker, Sunflower Capital, LLC; Quest Capital Alliance I, L.L.C. and Quest Capital Alliance II, L.L.C.

        (b)    As consideration for accepting this Note, Maker shall issue to Lender a warrant to purchase 500,000 shares of Maker's common stock at an exercise price of $0.25 per share. The warrant may be exercised in whole or in part at any time for a period of two (2) years from the date of issuance; provided, however, in order to avoid a destabilization of Maker's stock price, Lender shall not on any day sell/trade Maker's common stock in an amount that exceeds 75% of the highest day's total sales/trades of such stock over the previous 90 days. For example, if the highest day total traded shares

in the last 90 days is 133,500 shares, ViaSat could then trade 100,125 or fewer shares on the day in question.

(c)    All amounts due and payable under this Note shall be prepaid in full as a part of (i) Maker's dissolution or liquidation, (ii) the consummation by Maker of any merger, consolidation or other business combination, if the beneficial owners of the voting capital stock of Maker ("*Voting Securities*") immediately prior to such transaction beneficially own in the aggregate Voting Securities (or voting securities in the case of a surviving entity other than Maker) representing an ownership percentage (or voting power in the case of a surviving entity other than Maker) of less than 50% immediately after giving effect to such transaction, or (iii) the acquisition by a third party of all or substantially all of Maker's capital stock, equity interests or assets  In addition, all amounts due and payable under this Note shall be prepaid in full in the event Maker borrows or receives an equity infusion of an amount in excess of $10,000,000.00.  Each of the events set forth in this Section 3(c) is sometimes hereinafter referred to as a "*Mandatory Prepayment Event.*"

4.    **Place of Payment.**    All amounts payable hereunder shall be payable in immediately available funds at the office of Lender, 6155 El Camino Real, Carlsbad, CA 92009, Attention: Controller, unless another place of payment shall be specified in writing by Lender.

5.    **Application of Payments.**  Payment on this Note shall be applied first to costs and expenses due hereunder, then to accrued interest, and thereafter to the outstanding balance of the principal amount hereof.  Payments made by subsidiaries of Maker are authorized by Lender under this Note;  provided that Maker shall remain responsible for all payments and other obligations hereunder.

6.    **Representations and Warranties.**  Maker represents and warrants to Lender that:

(a)    Maker is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware;

(b)    Maker has full corporate power and authority to enter into this Note and to perform its obligations hereunder;

(c)    the execution and delivery of this Note, and the performance by Maker of its obligations hereunder, have been duly authorized by Maker;

(d)    this Note has been duly executed and delivered by Maker and is a legal, valid and binding obligation of Maker, enforceable against Maker in accordance with its terms;

(e)    none of the execution, delivery or performance of this Note will violate, conflict with or result in a breach or default under any provision of Maker's charter or bylaws, any laws or regulations to which Maker is subject, or any contract, lease, license, agreement or other arrangement to which Maker is a party or is otherwise bound; and

ViaSat - SiriCOMM Promissory Note v3 0.DOC

2

(f)    Maker has assets the fair market value of which exceed its liabilities, and Maker will not be rendered insolvent, under-capitalized or unable to pay maturing debts by the execution or performance of this Note.

7.    **Affirmative Covenants.** Maker shall:

(a)    Upon reasonable notice, at any time during regular business hours and as often as reasonably requested (but not so as to materially interfere with the business of Maker) permit the Lender or any authorized employee, agent, or representative thereof, at their own cost and expense prior to the occurrence of an Event of Default, to examine, audit and make copies and abstracts from the records and books of account of, and to visit and inspect the properties of and to discuss the affairs, finances and accounts of Maker with its president, chief executive officer, and/or chief accounting officer and, following the occurrence of an Event of Default, independent accountants. The Lender or any authorized employee, agent or representative shall observe all general and safety and security regulations while at Makers premises.

(b)    promptly inform Lender of the occurrence of any Event of Default, or of any other occurrence which could reasonably be expected to cause a Material Adverse Change (as defined below); and

(c)    immediately inform Lender of any Mandatory Prepayment Event.

8.    **Default.** Each of the following events shall be an "*Event of Default*" hereunder:

(a)    Maker fails to pay timely any of the principal, interest or other amounts due under this Note on the date the same become due and payable (whether at the stated maturity, by acceleration or otherwise);

(b)    if Maker shall fail to perform, in the time and manner required, any of its obligations or covenants under, or shall fail to comply with any of the provisions of, this Note, which does not involve the failure to make a payment when due (be it principal, interest or otherwise) and which, as to any such failure that is capable of being cured, is not cured by Maker within ten (10) days after the occurrence of such Event of Default;

(c)    Maker files any petition or commences any case or other proceeding with respect thereto for relief under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, liquidation or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors, or admits in writing its inability to pay or generally fails to pay its debts as they mature or become due, or Maker dissolves or ceases to continue to exist, or takes any corporate action in furtherance of any of the foregoing;

(d)    an involuntary petition is filed or any case or other proceeding is commenced against Maker (unless such petition is dismissed or discharged within thirty (30) days) under any bankruptcy, reorganization, arrangement, insolvency, adjustment of debt, liquidation or moratorium statute now or hereafter in effect, or a custodian, receiver, trustee,

ViaSat - SiriCOMM Promissory Note v3 0.DOC                    3

liquidator, assignee for the benefit of creditors (or other similar official) is applied for or appointed for Maker or is applied for or appointed to take possession, custody or control of any property of Maker;

(e)  [intentionally omitted];

(f)  any representation or warranty made by Maker under this Note shall have been false or misleading in any material respect when made;

(g)  a material adverse change shall have occurred in (i) the ability of Maker to perform its obligations under this Note in accordance with its terms, (ii) the ability of Lender to enforce any of its rights or remedies with respect to the obligations of Maker under this Note, or (iii) the assets, properties (whether tangible or intangible), condition (financial or otherwise), results of operations, business or prospects of Maker (each of the foregoing, a "*Material Adverse Change*"); or

(h)  this Note shall cease, for any reason, to be in full force and effect in all material respects, or Maker shall so assert.

9.  **Remedies.**  Upon the occurrence and during the continuance of an Event of Default hereunder:

(a)  all unpaid principal, accrued interest and other amounts owing hereunder shall be immediately due, payable and collectible by Lender pursuant to applicable law;

(b)  any and all unpaid principal due under this Note shall thereafter bear interest at the maximum rate set forth in Section 2 hereof; and

(c)  Lender may exercise any and all rights and remedies it may have under this Note or under applicable law:

All rights and remedies shall be cumulative and not exclusive.  The failure of Lender to exercise all or any of its rights, remedies, powers or privileges hereunder, under any other agreement or applicable law in any instance shall not constitute a waiver thereof in that or any other instance.

10.  **Expenses.**  If an Event of Default shall have occurred or Maker otherwise breaches its obligations under this Note, Maker shall pay reasonable attorneys' fees to Lender together with reasonable costs and expenses of collection, including, without limitation, any attorneys' fees, costs and expenses relating to any proceedings with respect to the bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation of Maker or any party to any agreement or instrument securing this Note.

11.  **Waiver.**  Maker, for itself and its legal representatives, successors and assigns, hereby expressly waives demand, presentment, notice of dishonor, protest and notice of protest, and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note and agrees that any extension, renewal or postponement of the time of payment or any other indulgence to, or release of any person now or hereafter obligated for the payment of this Note shall not affect Maker's liability hereunder.

12.    **Governing Law.**  This Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California, excluding conflict of laws principles that would cause the application of laws of any other jurisdiction.

13.    **Successors and Assigns.**  The provisions of this Note shall inure to the benefit of and be binding on any successor to Maker and shall extend to any holder hereof.  Maker shall not assign its obligations under this Note without Lender's prior written consent, determined in Lender's sole discretion, and any such attempted assignment which does not comply with this sentence, shall be void and of no effect.  Lender may assign, transfer, participate or endorse its rights under this Note without the consent or approval of Maker, and all such rights shall inure to Lender's successors and assigns. Upon request, Maker shall, at its own expense, execute and deliver to the assignee of this Note, a replacement note of equal and like tenor in an amount assigned to and assumed by such assignee. Lender may at any time pledge this Note to any of its secured lenders as collateral for any of Lender's obligations.

14.    **Entire Agreement; Amendments.**  This Note constitutes the entire agreement and understanding of the parties, and supersede and replace in their entirety any prior discussions, agreements, etc., all of which are merged herein and therein.  None of the terms of this Note may be amended or otherwise modified except by an instrument executed by each of Maker and Lender.

[*The remainder of this page is intentionally blank*]

IN WITNESS WHEREOF, this Promissory Note has been duly executed as an instrument under seal as of the date first set forth above.

MAKER:                                    SIRICOMM, INC.

                                          By: _Mark L Grannell_

                                          Name: _Mark L. Grannell_

                                          Title: _President & CEO_

## Schedule 1

Compound Period:  Monthly
Nominal Annual Rate:  9.500 %
CASH FLOW DATA

| | Event | Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|---|
| 1 | Loan | 05/15/2007 | 1,144,246.48 | 1 | | |
| 2 | Payment | 06/15/2007 | Interest Only | 6 | Monthly | 11/15/2007 |
| 3 | Payment | 12/15/2007 | 68,456.97 | 18 | Monthly | 05/15/2009 |

AMORTIZATION SCHEDULE -

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| Loan | 06/15/2007 | | | | 1,144,246.48 |
| 1 | 07/15/2007 | 9,058.62 | 9,058.62 | 0.00 | 1,144,246.48 |
| 2 | 08/15/2007 | 9,058.62 | 9,058.62 | 0.00 | 1,144,246.48 |
| 3 | 09/15/2007 | 9,058.62 | 9,058.62 | 0.00 | 1,144,246.48 |
| 4 | 10/15/2007 | 9,058.62 | 9,058.62 | 0.00 | 1,144,246.48 |
| 5 | 11/15/2007 | 9,058.62 | 9,058.62 | 0.00 | 1,144,246.48 |
| 6 | 12/15/2007 | 9,058.62 | 9,058.62 | 0.00 | 1,144,246.48 |
| 7 | 01/15/2008 | 68,456.97 | 9,058.62 | 59,398.35 | 1,084,848.13 |
| 2007 Totals | | 122,808.69 | 63,410.34 | 59,398.35 | |
| | | | | | |
| 8 | 02/15/2008 | 68,456.97 | 8,588.38 | 59,868.59 | 1,024,979.54 |
| 9 | 03/15/2008 | 68,456.97 | 8,114.42 | 60,342.55 | 964,636.99 |
| 10 | 04/15/2008 | 68,456.97 | 7,636.71 | 60,820.26 | 903,816.73 |
| 11 | 05/15/2008 | 68,456.97 | 7,155.22 | 61,301.75 | 842,514.98 |
| 12 | 06/15/2008 | 68,456.97 | 6,669.91 | 61,787.06 | 780,727.92 |
| 13 | 07/15/2008 | 68,456.97 | 6,180.76 | 62,276.21 | 718,451.71 |
| 14 | 08/15/2008 | 68,456.97 | 5,687.74 | 62,769.23 | 655,682.48 |
| 15 | 09/15/2008 | 68,456.97 | 5,190.82 | 63,266.15 | 592,416.33 |
| 16 | 10/15/2008 | 68,456.97 | 4,689.96 | 63,767.01 | 528,649.32 |
| 17 | 11/15/2008 | 68,456.97 | 4,185.14 | 64,271.83 | 464,377.49 |
| 18 | 12/15/2008 | 68,456.97 | 3,676.32 | 64,780.65 | 399,596.84 |
| 19 | 01/15/2009 | 68,456.97 | 3,163.47 | 65,293.50 | 334,303.34 |
| 2008 Totals | | 821,483.64 | 70,938.85 | 750,544.79 | |
| | | | | | |
| 20 | 02/15/2009 | 68,456.97 | 2,646.57 | 65,810.40 | 268,492.94 |
| 21 | 03/15/2009 | 68,456.97 | 2,125.57 | 66,331.40 | 202,161.54 |
| 22 | 04/15/2009 | 68,456.97 | 1,600.45 | 66,856.52 | 135,305.02 |
| 23 | 05/15/2009 | 68,456.97 | 1,071.16 | 67,385.81 | 67,919.21 |
| 24 | 06/15/2009 | 68,456.97 | 537.76 | 67,919.21 | 0.00 |
| 2009 Totals | | 342,284.85 | 7,981.51 | 334,303.34 | |
| | | | | | |
| Grand Totals | | 1,286,577.18 | 142,330.70 | 1,144,246.48 | |

ViaSat - SiriCOMM Promissory Note v3 0.DOC          7



1725 Breckinridge Plaza
Duluth, GA 30096
USA
Tel: +1 (678) 924-2400
Fax: +1 (770) 935-3292

November 16, 2007

SiriCOMM, Inc.
4710 East 32nd Street
Joplin, Missouri 64804 USA

Attention:    Mr. Mark Grannell
              President and CEO

Subject:    Final Notice of Termination - Contract 051004, Service Agreement (the
            "Agreement")

Dear Mr. Grannell:

On April 6, 2007 ViaSat, Inc. ("ViaSat") notified SiriCOMM, Inc. ("SiriCOMM") of our
intention to terminate the Agreement effective June 6, 2007. On June 5, 2007 ViaSat
extended this notice period reserving the right to immediately terminate the Agreement
upon further written notice. See attached letters.

Although ViaSat has given SiriCOMM ample time to cure its material breaches of the
Agreement, SiriCOMM has failed to cure such breaches and continues to be delinquent in
amounts due and owing to ViaSat. Accordingly, please take notice that ViaSat is hereby
terminating the Agreement effective immediately.

After months of effort to resolve the outstanding payment issues under the Agreement
ViaSat has no choice but to take this action.

Please contact me at 678-924-2681 or email; brad.malloch@viasat.com should you have
any questions regarding this letter.

Regards,

Brad Malloch
Director, Contracts
ViaSat, Inc.

Attachment

JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

## I. (a) PLAINTIFFS
VIASAT, INC.

## DEFENDANTS
SIRICOMM, INC. and DOE #1

2007 NOV 19 PM 4: 23

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY PW DEPUTY

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Jasper County, MO
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Kenneth M. Fitzgerald
LATHAM & WATKINS, LLP
600 W. Broadway, Ste. 1800
San Diego, CA 92101
619.236.1234

ATTORNEYS (IF KNOWN)

'07 CV 2206 LAB (AJB)

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)
Action for breach of contract and declaratory relief based on diversity under 28 USC § 1332.

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 650 Airline Regs. | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | **LABOR** | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motion to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Conditions | | | |

## VI. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ 4,623,315.10    CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE _____    Docket Number _____

DATE  11/19/07

SIGNATURE OF ATTORNEY OF RECORD  Kenneth M. Fitzgerald / PW

#144607  $350  PO 11/19/07

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 144667   — KD**
**＊＊C O P Y＊＊**
**November 19. 2007**
**16:23:07**

**Civ Fil Non-Pris**
USAO #.: 07CV2206
Judge..: LARRY A BURNS
Amount.:                  $350.00 CK
Check#.: BC 6103

**Total—> $350.00**

FROM: CIVIL FILING
      VIASAT, INC. V. SIRICOMM, INC.